IN RE HAMIL, A MINOR.

[Cite as In re Hamil (1982), 69 Ohio St. 2d 97.]

(No. 81-97—Decided February 3, 1982.)

*Mr. David Ferrell,* for appellee Jeffrey R. Hamil.

*Ms. Randi Gelfand Lewis,* for appellees parents of Jeffrey.

*Mr. James R. Unger,* prosecuting attorney, and *Mr. Michael P. Zirpolo,* for appellees Stark County Welfare Department and Stark County Board of Mental Health and Mental Retardation.

*Mr. William J. Brown,* attorney general, *Messrs. Frost & Jacobs* and *Mr. Michael L. Cioffi,* for appellant.

*Mr. Alan F. Berliner,* for Ohio Youth Services Network.

KRUPANSKY, J. The Juvenile Court concluded appellant ODMH was secondarily liable for the cost of Jeffrey's care at Bellefaire. The Court of Appeals modified this order somewhat and imposed primary liability upon ODMH. After reviewing the applicable authority we conclude ODMH's duty is restricted to maintaining those individuals confined to institutions owned and operated by the state and does not extend to absorbing the cost of care for patients placed in private psychiatric facilities such as Bellefaire. In light of this, we reverse.

The issue presented for our consideration herein is does the Juvenile Court have the authority to order the ODMH to pay the cost of care of a child placed in a private, non-public psychiatric hospital.

Section 1 of Article VII of the Ohio Constitution, dealing with public institutions, provides in relevant part:

"Institutions for the benefit of the insane, blind, and deaf and dumb, shall always be fostered and supported by the state; * * *."

Relying upon Section 1, Article VII it is clear the state has a strong responsibility to care for citizens placed in its public institutions such as Sagamore Hills. No justification exists, however, for imposing a similar duty upon the state to care for persons confined to privately operated facilities over which the state has no control such as Bellefaire. The correctness of this conclusion becomes even more apparent when one considers R. C. 5121.01 and the case of *Bureau of Support* v. *Kreitzer* (1968), 16 Ohio St. 2d 147.

R. C. 5121.01 stated in part: "All patients of a benevolent institution, shall be maintained at the expense of the state." (134 Ohio Laws Pt. II 1795.) Historically under Ohio law the

phrase "benevolent institution" has been used to refer to state-owned and operated institutions, not private institutions such as Bellefaire. See G.C. 1807 to 2247 (1910) and "An Act to reorganize the Benevolent Institutions of the State of Ohio," R. S. Chapter 15 (Swan 1854). Furthermore, in *Kreitzer, supra,* this court made its position abundantly clear as to R. C. 5121.01 *et seq.* when it stated at page 149:

"Ohio's duty ultimately is to provide the cost of maintenance only for the needy and distressed members of its institutional population." It is true the *Kreitzer* case is factually distinguishable from the case at bar. However, the court's determination in *Kreitzer* is equally applicable to the instant situation: the state has no obligation to maintain patients in non-public institutions. *Kreitzer* also determined the cost of maintenance and support of patients in public institutions rests primarily with the patient himself or his estate; the state's liability is secondary. See R. C. 5121.03 and 5121.04(B). It is apparent from the authorities cited above that constitutional, statutory and common law justifications exist for confining ODMH's duty to maintaining only those individuals residing in its state institutions.

The question then becomes whether some other authority can be found which would warrant the Juvenile Court's order that ODMH provide the cost of Jeffrey's care at Bellefaire. Jeffrey's parents rely upon R. C. 2151.23(A)(4), in conjunction with R. C. 2101.24, to substantiate their assertion that the Juvenile Court possesses the requisite jurisdiction and power to order the state, through ODMH, to pay for Jeffrey's care at Bellefaire. R. C. 2151.23(A)(4) grants the Juvenile Court exclusive original jurisdiction to " * * * exercise the powers and jurisdiction given the probate division of the court of common pleas *in Chapters 5122* and *5123 of the Revised Code,* if the court has probable cause to believe that a child otherwise within the jurisdiction of the court is a mentally ill person subject to hospitalization by court order, as defined in Section 5122.01 of the Revised Code * * * ." (Emphasis added.)

From this section Jeffrey's parents conclude a Juvenile Court which has jurisdiction over a mentally-ill juvenile subject to hospitalization by court order, is invested with all powers inherent in the Probate Court, including the grant of plenary

power found in R. C. 2101.24.[1] Jeffrey's parents contend that this grant of plenary power enables the court to fully dispose of any matter properly before it, including resolving any financial aspects necessary to implement their disposition. In order to reach this conclusion one must ignore the language of R. C. 2151.23(A)(4), which only grants the Juvenile Court those powers found in R. C. Chapters 5122 and 5123, and does not bestow upon it those powers found in R. C. Chapter 2101. Consequently, unless another statute exists which affirmatively grants the Juvenile Court authority to order ODMH to pay for Jeffrey's care in a private psychiatric facility, the courts below were acting beyond the scope of their jurisdiction when they made such orders. Jeffrey's parents contend R. C. 5122.15 authorizes the action taken by the lower courts. We disagree.

R. C. 5122.15(A) mandates a full hearing be conducted to determine whether an individual is a mentally ill person subject to hospitalization by court order. On July 13, 1979 such hearing was held for Jeffrey Hamil. It was at this time the court concluded Jeffrey would benefit from hospitalization. After reaching this conclusion the court had several options available under R. C. 5122.15(C) which provided:

"If, upon completion of the hearing, the court finds clear and convincing evidence that the respondent is a mentally ill person subject to hospitalization by court order, the court may order the respondent's discharge or may order the respondent, for a period not to exceed ninety days to:

" (1) A hospital operated by the department of mental health and mental retardation;

" (2) A nonpublic hospital;

" (3) The veterans' administration or other agency of the United States government;

" (4) A community mental health clinical facility;

" (5) Receive private psychiatric or psychological care and treatment.

" (6) Any other suitable facility or person consistent with

[1] R. C. 2101.24 provides, in pertinent part:

"The probate court shall have plenary power at law and in equity fully to dispose of any matter properly before the court, unless the power is expressly or otherwise limited or denied by statute."

the diagnosis, prognosis, and treatment needs of the respondent." (137 Ohio Laws Pt. II 3295) [2]

The state concedes it is secondarily liable for the cost of care of a patient confined in a state hospital, such as Sagamore Hills, pursuant to R. C. 5122.15(C)(1) since such facility is a "benevolent institution" within the well-accepted meaning of that term. However, there is no similar state responsibility for individuals placed in facilities pursuant to R. C. 5122.15(C)(2), (3), (4), (5) and (6). There are two reasons for this differing treatment: first, the facilities listed in R. C. 5122.15(C)(2), (3), (4), (5) and (6) are not traditionally within the institutions considered "benevolent institutions;" and second, R. C. 5122.15 (D) placed an additional limitation on these subsections by requiring the court to obtain consent from the hospital, facility or person prior to ordering an individual's confinement thereto.

In light of the limitation contained in R. C. 5122.15(D), it is apparent a civil committee [3] possessed no "right" to placement in a facility classified under R. C. 5122.15(C)(2), (3), (4), (5) or (6). In the present case, for instance, Bellefaire only agreed to accept Jeffrey if satisfactory arrangements were made to guarantee the cost of care. Since Jeffrey's parents were unable to assume the entire cost the Juvenile Court ordered ODMH to pay all costs not otherwise covered. If ODMH had not been ordered to assume the additional expenses, Bellefaire would not have assented to Jeffrey's admission. Therefore, if the Juvenile Court was acting outside its authority in making this order, Jeffrey should not have been admitted to Bellefaire.

Jeffrey's parents contend the Juvenile Court was empowered to make this order pursuant to R. C. 5122.15(E) and (F). According to Jeffrey's parents, once the superintendent at Sagamore Hills advised the Juvenile Court their facility was neither the most appropriate nor the least restrictive facility for Jeffrey, it was imperative, under these two subsections, for the court to either order Jeffrey placed in a less restrictive en-

---

[2] In addition to certain changes in language, a seventh alternative was added on April 30, 1980 (Am. Sub. S.B. No. 297).

[3] As used herein a "civil committee" means a person civilly committed to a mental institution.

vironment or dismiss the case.[4] We agree a civil committee, such as Jeffrey, has a statutory right to be placed in the least restrictive environment *available;* however, appellees' argument completely misinterprets the word "available." Adhering to the construction proposed by appellees, any time a less restrictive alternative or environment exists, regardless of cost, a civil committee must be transferred to that locale or released from custody. Surely when the General Assembly adopted R. C. 5122.15(E) and (F) it did not intend the state of Ohio to assume the cost of sending mentally ill individuals to expensive, private, non-public facilities, simply because those facilities might offer less restrictive treatment alternatives. The cost of fostering such a policy might prove to be astronomical.

ODMH must care for thousands of mentally-ill individuals who are citizens of Ohio. The treatment options which ODMH is able to offer are vastly reduced by tight budgetary constraints which tend to dictate the amount of money which may be allocated to any one facility or individual. Unquestionably, most people in need of psychiatric hospitalization would benefit from treatment in an exclusive private facility such as Bellefaire. However, this approach is economically infeasible. Other states dealing with similar situations have recognized the importance of allocating sparce government resources in such a way as to benefit the largest number of citizens. See *State in Interest of D. F.* (1976), 145 N.J. Super. 381, 367 A. 2d 1198, and *In re Doe* (R.I. 1978), 390 A. 2d 390.

Unfortunately, economic considerations are also prevalent

---

[4] R. C. 5122.15(E) stated:

"In determining the place to which, or the person with whom, the respondent is to be committed, the court shall consider the diagnosis, prognosis, and projected treatment plan for the respondent and order the implementation of the least restrictive alternative *available* and consistent with treatment goals." (137 Ohio Laws Pt. II 3295.) (Emphasis added.)

R. C. 5122.15(F) stated, in relevant part:

"During such ninety-day period the hospital, facility, or person shall examine and treat such individual. If at any time prior to the expiration of the ninety-day period, it is determined by the hospital, facility, or person that the respondent's treatment needs could be equally well met in an *available* and appropriate less restrictive environment:
" * * *

"(3) The court shall dismiss the case or order placement in a less restrictive environment." (137 Ohio Laws Pt. II 3295.) (Emphasis added.)

in determining the "availability" of a facility within the meaning of R. C. 5122.15(E) and (F). If the supervisor of an institution designated within one of the alternatives listed in R. C. 5122.15(C) (2) through (6) refuses to accept a committee because he or his family cannot guarantee payment for the cost of care, then the least restrictive alternative which can be said to be "available" is a state hospital. Applying this interpretation to the instant case, if Jeffrey Hamil's parents were unable to guarantee payment of the cost of care at Bellefaire, then Bellefaire was not an "available" alternative. The Juvenile Court then had the option of continuing Jeffrey's commitment at Sagamore Hills or transferring Jeffrey to another state hospital, since a state hospital would be the only alternative "available."

Jeffrey's parents contend their circumstances are unique because a substantial portion of Jeffrey's expenses at Bellefaire will be paid by insurance, thus placing a very minimal burden on the state. We agree the expenditure required of ODMH in the instant cause might prove to be negligible. Our concern, however, reaches beyond the narrow boundaries of the present controversy to the instances where ODMH would be called upon to absorb the entire cost of treatment at an expensive private institution. The approach taken by the courts below ordering ODMH to assume liability for Jeffrey's maintenance and care in a private, non-public psychiatric institution may arguably be reasonable under the facts of the instant cause; however, the repercussions of such a decision would strike a devastating blow to Ohio's mental health programs.

The courts in making decisions must keep the problems with which they deal in perspective. The division of power as granted by the Constitution to the three branches of government must be kept in mind at all times. The General Assembly passes the laws and determines the budget for governmental agencies. No doubt, budgetary expenditures are not considered by doctors making recommendations within the framework of the various code sections with which they must deal. The courts, on the other hand, must interpret the law and must not legislate. If a conclusion other than that promulgated herein is required, the General Assembly must speak.

Jeffrey's parents' final assertion is the director of ODMH

abused his discretion in refusing to underwrite and guarantee the cost of Jeffrey's psychiatric care in a private facility. As stated in *State, ex rel. Armstrong,* v. *Davey* (1935), 130 Ohio St. 160, 163, before there can be a finding of abuse of discretion: " 'it must clearly appear that such officer has so far departed from the line of his duty under the law that it can be said he has in fact so far abused such discretion that he has neglected or refused to exercise any discretion.' "

In light of our prior conclusions it is clear no abuse of discretion can be found to exist in this case.

The judgment of the Court of Appeals is reversed and we remand the cause to the trial court for proceedings in accordance with this opinion.

*Judgment reversed.*

SWEENEY, HOLMES and C. BROWN, JJ., concur.

CELEBREZZE, C. J., W. BROWN and LOCHER, JJ., dissent.

WILLIAM B. BROWN, J., dissenting. Under the facts of this case, the Juvenile Court did not abuse its discretion in ordering the Ohio Department of Mental Health and Mental Retardation to pay the cost of care for a child at a non-public psychiatric hospital. Hence, I must respectfully dissent.

The intent of the General Assembly to permit private placement of the mentally ill is demonstrated primarily by two provisions. R. C. 5122.15 [5] provides that a court may order a mentally ill person to a nonpublic hospital, to receive private psychiatric or psychological care and treatment, or to any other suitable facility.

---

[5] In pertinent part, R. C. 5122.15 provided that:

" (C) If, upon completion of the hearing the court finds clear and convincing evidence that the respondent is a mentally ill person subject to hospitalization by court order, the court may order the respondent's discharge or may order the respondent, for a period not to exceed ninety days to:

" (1) A hospital operated by the department of mental health and mental retardation;

" (2) A nonpublic hospital;

" (3) The veterans' administration or other agency of the United States government;

" (4) A community mental health clinical facility;

" (5) Receive private psychiatric or psychological care and treatment;

" (6) Any other suitable facility or person consistent with the diagnosis, prognosis, and treatment need of the respondent."

This language of R. C. 5122.15(C) was amended, effective April 30, 1980.

In addition, the ability to place the mentally ill in nonpublic institutions is also found in R. C. 5119.01,[6] which allows a director of a hospital to contract for care with persons, organizations or agencies outside of his hospital. Thus, it is clear that the General Assembly has not limited placement to public facilities.

Contrary to the majority's holding, it is my opinion that the Juvenile Court has plenary power as to placement of a mentally ill juvenile. R. C. 2101.24 [7] affords a probate court plenary power to dispose of matters before it. And by virtue of the express language of R. C. 2151.23(A)(4),[8] the General Assembly has clearly granted the Juvenile Court the right to exercise the jurisdiction of the probate division with regard to R. C. Chapters 5122 and 5123. Since the Probate Court has "plenary power" in this area,[9] the Juvenile Court, in exercising the jurisdiction of the Probate Court, also has plenary power in this area. Based on its plenary power, the Juvenile Court acted within its jurisdiction when it ordered placement in a private facility and provided for payment therefor.

This is not a case where a patient simply requested care in a private facility and received it. Rather, this is a case where the juvenile was subjected to hospitalization by court order, where the superintendent at Sagamore Hills informed the

---

[6] In relevant part, R. C. 5119.01 provided that:

"The director may contract with hospitals licensed by the division of mental health under section 5123.16 of the Revised Code for the care and treatment of mentally ill patients, or with persons, organizations, or agencies for the custody, supervision, care, or treatment of mentally ill persons receiving services elsewhere than within the enclosure of a hospital under section 5123.12 of the Revised Code."

This language of R. C. 5119.01 was amended, effective July 1, 1980.

[7] R. C. 2101.24, which defines the jurisdiction of the Probate Court, provides, in pertinent part, that:

"* * *

"The probate court shall have plenary power at law and in equity fully to dispose of any matter properly before the court, unless the power is expressly otherwise limited or denied by statute. * * * "

[8] R. C. 2151.23 provides, in pertinent part:

"(A) The juvenile court has exclusive original jurisdiction under the Revised Code:

"* * *

" (4) To exercise the powers and jurisdiction given the probate division of the court of common pleas in Chapters 5122 and 5123 of the Revised Code * * *."

[9] R. C. 2101.24.

court, as is required by R. C. 5122.15(F) and 5122.27, that the public facility was not the least restrictive nor most appropriate placement, and where the superintendent himself recommended to the court that placement be made in a nonpublic facility. Furthermore, this is a case where the Juvenile Court, in an independent evaluation, determined that the private facility was the most appropriate less restrictive environment for the mentally ill juvenile.

The Juvenile Court in this case was not faced with the choice of placing the juvenile in a public facility or a private facility. Rather, the court, as mandated by statute, was faced with the option of placing the mentally ill juvenile in the least restrictive environment,[10] which was determined by the state to be a private institution, or dismissing the case. Surely, neither the needs of the juvenile nor the needs of society would best be served by dismissing the case.

For the foregoing reasons, I must respectfully dissent.

CELEBREZZE, C. J., and LOCHER, J., concur in the foregoing dissenting opinion.

---

[10] Indeed, in some cases, the director may have no other recourse than to recommend placement of a mentally ill individual in a private facility. R. C. 5122.15(E) requires that a patient be placed in the " * * * least restrictive alternative available and consistent with treatment goals." The General Assembly has mandated, through R. C. 5122.15 and 5122.27, that when the head of the hospital to which the mentally ill person is assigned is unable to provide the least restrictive environment consistent with the treatment plan, he must immediately notify the court. The court, in turn, shall dismiss the case, *i.e.,* discharge the patient, or order placement in the least restrictive environment.