### In re HOODLET.

[Cite as *In re Hoodlet* (1991), 72 Ohio App.3d 115.]

Court of Appeals of Ohio,
Athens County.

No. 1432.

Decided Jan. 10, 1991.

*Anthony J. Celebrezze, Jr.,* Attorney General, and *Beverly Yale Pfeiffer,* Assistant Attorney General, for appellant Ohio Department of Mental Health.

*Nolan & Oremus Co., L.P.A.,* and *Frederick L. Oremus,* for appellant Southern Consortium for Children.

*K. Robert Toy,* Assistant Prosecuting Attorney, for appellee state of Ohio.

*Sowash, Carson & Shostak* and *Herman A. Carson,* guardian ad litem.

HARSHA, Judge.

This is an appeal from a judgment entered by the Athens County Court of Common Pleas, Juvenile Division, ordering that the Ohio Department of Mental Health ("ODMH") and the Southern Consortium for Children ("SCC"), appellants, pay the costs involved in placing Michael Hoodlet, an adjudicated delinquent child, in a private residential mental health facility.

ODMH assigns the following error:

"The juvenile court acted beyond the scope of its authority when it ordered the Ohio Department of Mental Health to pay the cost of care of a juvenile placed in a private, non-public mental health facility."

SCC assigns the following errors:

"I. The juvenile court erred in ordering the Southern Consortium for Children to pay for a portion of this juvenile's care when the consortium was

not a party to the proceedings until the final dispositional order, thereby denying the consortium fundamental due process rights of notice and an opportunity to be heard.

"II. Absent any finding that the juvenile was mentally ill and subject to court ordered hospitalization, the juvenile court was without authority to order the Southern Consortium for Children to pay for said juvenile's inpatient mental health facility care."

On February 1, 1989, a complaint was filed by Pamela Artz, an Athens County Children's Services family services worker, which alleged that Michael Hoodlet was a delinquent child in that he had committed an act which constituted aggravated menacing. Following a detention hearing, the juvenile was eventually transported to the Millcreek Psychiatric Center for Children, which was operated by ODMH. On June 21, 1989, another delinquency complaint was filed, this one alleging that Hoodlet had committed an assault.

On July 27, 1989, after an admission to the delinquency charges, the trial court held a dispositional hearing at which the following pertinent evidence was either introduced or previously filed with the court. The child's condition had been diagnosed by a Millcreek psychiatrist as being a combination of an attention deficit hyperactivity disorder and a bipolar affective disorder, which required daily medication. Hoodlet's treatment team at Millcreek felt that his mental condition required protracted residential care in a structured setting and continued medication. Artz testified that Hoodlet had made progress at Millcreek and to continue this progress, he had to go to a place like Parmadale. Athens County Children's Services Deputy Director Mary Helen Graham testified that she had contacted thirteen different residential treatment centers, and that only Parmadale had agreed to accept Hoodlet, at a cost of $220 per day.

Graham testified that SCC had offered to contribute $69.33 per day to the expected cost and that she had requested a "state cluster" consisting of several state agencies, including ODMH, to pay the remainder. The Central Ohio Adolescent Center ("COAC"), a state operated residential treatment center, had closed in August 1988 and was not an available placement option. The "state cluster" subsequently offered to contribute $81.33 per day for a period up to one year. The trial court determined that the child was in need of further treatment in a residential mental health facility, and that Parmadale was the only appropriate placement for the child. The trial court's July 27, 1989 entry made ODMH a party to the proceeding and ordered that it pay the entire cost of the child's placement at Parmadale. ODMH was granted a request by the trial court for a second hearing as to the funding responsibilities.

On October 16, 1989, the hearing requested by ODMH was held, and the following pertinent evidence was adduced. Prior to August 1988, placement for juveniles was available at COAC, which had been funded and operated by ODMH. Following the closing of COAC, ODMH attempted to implement alternative methods of treatment for mentally disturbed juveniles, dividing the state into three separate planning areas and allocating approximately $2.5 million to each of the areas. One of these regions is covered by SCC, which is comprised of four community mental health boards representing ten south-eastern Ohio counties, including Athens County. SCC received approximately $603,000 for fiscal year 1989 to provide appropriate treatment for juveniles such as Hoodlet. ODMH witnesses testified that ODMH was not responsible financially for the costs of Hoodlet's treatment. SCC Regional Coordinator Steven Trout, called as a witness by appellee state of Ohio, testified that there was an agreement whereby SCC would pay $69.33 per diem of Hoodlet's Parmadale expenses, based upon its budget for fiscal year 1989, but that it would be financially unable to pay more than that amount, or even that amount should placements for other children within its region become necessary.

On October 25, 1989, the trial court issued a decision and journal entry in which it made SCC a party to the proceeding, ordered SCC to pay $70 per day for Hoodlet's treatment at Parmadale, retroactive to July 27, 1989, and further ordered ODMH to pay the remaining costs of Hoodlet's treatment at Parmadale.

ODMH's sole assignment of error asserts that the juvenile court acted beyond the scope of its authority when it ordered ODMH to pay the cost of care for Michael Hoodlet at Parmadale, and SCC's second assignment of error asserts that absent any finding that Hoodlet was mentally ill and subject to court-ordered hospitalization, the trial court was without authority to order SCC to pay for his care at Parmadale. In that these assignments of error raise similar issues of law and fact, they will be considered jointly.

■ Initially, we note that SCC argues, in addition to the same jurisdictional contention raised by ODMH, that the trial court failed to determine that Hoodlet was mentally ill and subject to court-ordered hospitalization. However, the record is replete with evidence concerning the juvenile's mental condition as diagnosed by several psychiatrists, as well as the trial court and the parties' acceptance of this evidence. Accordingly, SCC's argument in this regard is without merit.

■ With respect to ODMH and the remainder of SCC's contentions under these assignments of error, both parties assert that the trial court acted

beyond the scope of its authority in ordering them to pay the cost of care for a delinquent child placed in a private mental health facility.

The trial court relied upon R.C. 5119.01, 5119.06, 5119.47, and 2151.-355(A)(10) to conclude that it was acting within its discretion in ordering ODMH and SCC to pay for Hoodlet's medical care at the private mental health facility. Appellees claim that the trial court did not abuse its discretion in so ordering. However, the real issue is one of jurisdiction, not discretion. R.C. 2151.355(A)(10) allows a juvenile court, upon determining that a child is delinquent, to make "further disposition that the court finds proper." This broad discretionary power must, however, be limited by those statutory provisions regarding the juvenile court's jurisdiction. R.C. 2151.23(A) provides as follows:

"The juvenile court has exclusive original jurisdiction under the Revised Code:

" * * *

"(4) To exercise the powers and jurisdiction given the probate division of the court of common pleas in *Chapters 5122. and 5123. of the Revised Code,* if the court has probable cause to believe that a child otherwise within the jurisdiction is a mentally ill person subject to hospitalization by court order, as defined in section 5122.01 of the Revised Code, or a mentally retarded person subject to institutionalization by court order, as defined in section 5123.01 of the Revised Code." (Emphasis added.)

Analogously, pursuant to R.C. 2151.23(A)(4), the power of a juvenile court to order civil commitment of a mentally ill delinquent child is governed by R.C. Chapter 5122 rather than the provisions relied upon by appellees and the trial court, *i.e.*, R.C. 2151.355(A)(10) and R.C. Chapter 5119. R.C. 5121.01 provides that all patients or residents of a "benevolent institution" shall be maintained at the expense of the state. The phrase "benevolent institution" refers to state-owned and operated institutions and not private institutions like Parmadale. See *In re Hamil* (1982), 69 Ohio St.2d 97, 100, 23 O.O.3d 151, 152, 431 N.E.2d 317, 318, citing G.C. 1807 to 2247 (1910) and "An Act to Reorganize the Benevolent Institutions of the State of Ohio," R.S. Chapter 15 (Swan 1854).

The Ohio Supreme Court has held that the juvenile court acts beyond the scope of its jurisdiction when it orders the Ohio Department of Mental Health to pay the cost of care of a child placed in a private, non-public psychiatric hospital. *Hamil, supra; Bureau of Support v. Kreitzer* (1968), 16 Ohio St.2d 147, 45 O.O.2d 480, 243 N.E.2d 83; Kurtz & Giannelli, Ohio Juvenile Law (2 Ed.1989) 202, T 13.10. Unless another statute exists in R.C. Chapter 5122 or 5123 which "affirmatively grants the Juvenile Court authority to order ODMH to pay for * * * care in a private psychiatric facility," the trial court, in the

case at bar, erred in ordering ODMH, and analogously, SCC, to pay the costs of the delinquent child's private psychiatric care. *Hamil, supra,* 69 Ohio St.2d at 101, 23 O.O.3d at 153, 431 N.E.2d at 319. In the instant case, neither R.C. 2151.355(A)(10), 5119.01, 5119.06, nor 5119.47 affirmatively granted the trial court this power. See, *e.g.,* R.C. 2151.23(A)(4).

We recognize that COAC, the state operated mental health facility, closed following the *Hamil* decision.[1] However, there is no legal support for distinguishing that holding when considering R.C. 2151.23(A)(4) and R.C. Chapters 5122 and 5123, *i.e.,* the same sections which the *Hamil* court found to be controlling. As noted by the Ohio Supreme Court in *Hamil, supra,* 69 Ohio St.2d at 103–104, 23 O.O.3d at 154–155, 431 N.E.2d at 320–321:

"We agree a civil committee, such as Jeffrey, has the statutory right to be placed in the least restrictive environment *available;* however, appellees' argument completely misinterprets the word 'available.' Adhering to the construction proposed by appellees, any time a less restrictive alternative or environment exists, regardless of cost, a civil committee must be transferred to that locale or released from custody. Surely when the General Assembly adopted R.C. 5122.15(E) and (F) it did not intend the state of Ohio to assume the cost of sending mentally-ill individuals to expensive, private, non-public facilities, simply because those facilities might offer less restrictive treatment alternatives. The cost of fostering such a policy might prove to be astronomical.

"ODMH must care for thousands of mentally-ill individuals who are citizens of Ohio. The treatment options which ODMH is able to offer are vastly reduced by tight budgetary constraints which tend to dictate the amount of money which may be allocated to any one facility or individual. Unquestionably, most people in need of psychiatric hospitalization would benefit from treatment in an exclusive private facility such as Bellefaire. However, this approach is economically infeasible. Other states dealing with similar situations have recognized the importance of allocating sparce [*sic*] government resources in such a way as to benefit the largest number of citizens. * * *

Unfortunately, economic considerations are also prevalent in determining the 'availability' of a facility within the meaning of R.C. 5122.15(E) and (F)." (Emphasis *sic* and citations omitted.)

---

1. As the trial court noted, COAC was not the lone children's psychiatric hospital operated by the state of Ohio. There remain two children's psychiatric hospitals operated by the state, *i.e.,* Sagamore Hills and Millcreek. Furthermore, it should be emphasized that even in cases where civil committees are placed in state-owned and operated institutions, *the state's liability is only secondary,* with the primary liability resting with the patient himself or his estate. *Hamil, supra,* 69 Ohio St.2d at 100, 23 O.O.3d at 153, 431 N.E.2d at 319; *Kreitzer, supra.*

It is impossible to have courts, on a case-by-case basis, ordering state agencies such as ODMH and multicounty organizations such as SCC to implement specific facilities and programs which are beyond the judicial function and in excess of the powers of the courts. *In re Parker* (1982), 7 Ohio App.3d 38, 7 OBR 41, 453 N.E.2d 1285. The clear holding of *Hamil, supra,* has most recently been followed by the Eighth Appellate District in *In re Lozano* (1990), 66 Ohio App.3d 583, 585 N.E.2d 889, as cited as supplemental authority by ODMH. As noted by the *Lozano* court, *supra,* at 586, 585 N.E.2d at 891, nothing in R.C. Chapters 2151, 5122, or 5123, *i.e.,* those chapters addressed to a juvenile court's jurisdiction, would allow the trial court to order ODMH to bear the expenses of private treatment of the child. *Hamil, supra.* Moreover, it is equally clear that pursuant to the express provisions of R.C. 2151.36,[2] the unpaid expenses incurred by Hoodlet's ordered stay at Parmadale must be "paid from the county treasury." See, *e.g., Lozano, supra,* at 587, 585 N.E.2d at 892. Accordingly, Athens County is ultimately responsible for the unpaid expenses incurred as a result of the trial court's July 27 and October 25, 1989 entries placing Hoodlet at Parmadale. R.C. 2151.36; *Lozano, supra.* Accordingly, ODMH's assignment of error and SCC's second assignment of error are sustained.

■ SCC's first assignment of error asserts that the trial court erred in ordering it to pay for a portion of the juvenile's care when it was not a party until the final disposition order. The trial court ordered that SCC be made a party following the final disposition hearing, pursuant to Juv.R. 2(16). This rule provides that "[p]arty" is defined as "a child who is the subject of a juvenile court proceeding, his spouse, if any, his parent, or if the parent of a child be himself a child, the parent of such parent and, in appropriate cases, his custodian, guardian or guardian ad litem, the state *and any other person specifically designated by the court.*" (Emphasis added.)

It appears to be axiomatic that persons or organizations designated as parties by the court be given timely notice sufficiently in advance of scheduled

---

**2.** R.C. 2151.36 provides, in pertinent part, as follows:

"*Any expense ordered by the court for the care, maintenance, and education of* dependent, neglected, abused, unruly, or *delinquent children,* or for orthopedic, medical or surgical treatment, or special care of such children under this chapter, *except the part of the expense as may be paid by the state or federal government, shall be paid from the county treasury* upon specifically itemized vouchers, certified to by the judge." (Emphasis added.)

We are aware that without state payments, placement of Michael at Parmadale would be impossible. We are also aware that without treatment, Michael most likely will not be able to conform his conduct to acceptable standards, nor would he progress in overcoming his emotional problems. These facts, however unfortunate and deserving of empathy as they may be, do not make statutory law. If a result other than that reached by this opinion is required, the action of the General Assembly is necessary.

court proceedings to afford a reasonable opportunity to prepare. See, *e.g.,* *In re Gault* (1967), 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527; Kurtz & Giannelli, *supra,* at Section 7.05(A). In the instant case, SCC was not designated as a party by the trial court until following the dispositional proceedings. Normally, this lack of notice and opportunity to prepare might be considered presumptively prejudicial. However, under the extremely limited circumstances in the case at bar, where the SCC representative was given notice and appeared as a witness for the state, the trial court asked whether SCC was represented by counsel at the beginning of the second dispositional hearing, and the SCC representative was given the opportunity to question other witnesses, we are not persuaded that the trial court's erroneous failure to designate SCC as a party earlier was necessarily prejudicial to SCC. However, the preferable method in this situation would have required the designation of SCC as a party prior to the second dispositional hearing regarding responsibility for costs, and, if the court was not aware that SCC should have been made a party until the hearing, it should have granted a continuance of the hearing to allow SCC to secure counsel and adequately prepare its case. SCC's first assignment of error is overruled.

In that we have sustained ODMH's sole assignment of error and SCC's second assignment of error, the judgment of the trial court is reversed and remanded for further proceedings consistent with this opinion.[3]

*Judgment reversed and cause remanded.*

STEPHENSON, J., concurs.

GREY, J., dissents.

---

**3.** As noted by SCC and appellee state of Ohio in their appellate briefs, Michael Hoodlet has been placed in a residential foster care program since December 31, 1989 due to the stay of the entry appealed from. Upon remand, the trial court should redetermine the least restrictive environment "available" for the delinquent child, with the possible cost of any treatment to be taken into consideration.